# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Pamela L. Helsper,                          **Civil No. 12-cv-708 (SRN/SER)**

       Plaintiff,

v.                                          <u>**REPORT AND RECOMMENDATION**</u>

Carolyn W. Colvin,
Acting Commissioner of Social Security,

       Defendant.

---

     Pamela L. Helsper, *pro se*, 320 Cari Park Land, Hastings, Minnesota 55033.

     Ana H. Voss, Esq., United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, on behalf of Defendant.

---

STEVEN E. RAU, United States Magistrate Judge.

     Pursuant to 42 U.S.C. § 405(g), Plaintiff Pamela L. Helsper ("Helsper") seeks review of the Acting Commissioner of Social Security Carolyn W. Colvin's ("the Commissioner") denial of Helsper's application for Social Security Disability Insurance ("SSDI") and Social Security Income ("SSI"). This matter has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and the District of Minnesota Local Rule 72.1. The parties filed cross-motions for summary judgment [Doc. Nos. 15 and 17]. For the reasons set forth, the Court recommends Helsper's *pro se* Motion for Summary Judgment be denied, and the Commissioner's Motion be granted.

## I. BACKGROUND

### A. Procedural History

There are two forms of Social Security benefits: SSDI and SSI. The purpose of the SSI program is to "assure a minimum level of income who are age 65 or over, or who are blind or disabled and do not have the sufficient income and resources to maintain a standard or living at the established Federal minimum income level." 20 C.F.R. § 416.110. In contrast, individuals earn SSDI by engaging in employment or in a covered self-employment and paying a self-employment tax. 20 C.F.R. §§ 404.101, 404.140. Payment of these taxes is a payment of an insurance premium. *See id.* Once the payment stops, coverage eventually ends. *See id.*

Helsper protectively filed for SSDI and SSI on February 13, 2009.[1] (Admin. R.) [Doc. No. 7 at 50–55]. In both applications, she listed an alleged disability onset date ("AOD") of December 9, 2007. (*Id.* at 50, 53). The applications claimed disability due to the following impairments: (1) neck pain, (2) cervical spondylosis,[2] and (3) unspecified myalgia/myositis.[3] (*Id.* at 51, 54). These impairments allegedly prevented Helsper from obtaining gainful employment. (*Id.* at 155).

---

[1] Protective filing is a written or oral statement that clearly establishes intent to file for Social Security Benefits. The effect of a protective filing is to preserve the date of application. For example, if a hypothetical claimant sends a letter postmarked to SSA on February 1 explaining she intends to file next month, February 1 becomes her filing date, even if she sends her application on March 27. Program Operations Manual Sys. (POMS), GN 00204.010C.5a-e. (SSA, June 23, 2011). There is no special format for a protective filing, as long as it clearly expresses intent to file, although oral statements of intent to file for Title II benefits must be documented and signed by a SSA employee. POMS, GN 00204.010B.1 – GN 00204.010B.4. (SSA, June 23, 2011).

[2] Cervical spondylosis is the stiffening or hardening of the vertebrae directly below the skull (cervical vertebrae, C1–C7), as well as the intervertebral discs, and surrounding soft tissue. *Stedman's Medical Dictionary*, Spondylosis (27th Ed. 2000).

[3] Myalgia is muscular pain. *Stedman's Medical Dictionary*, Myalgia (27th Ed. 2000). Myositis is inflammation of a muscle. *Stedman's Medical Dictionary*, Myositis (27th Ed. 2000).

Helsper's applications were denied initially on June 2, 2009 and again upon reconsideration on September 1, 2009.[4] (*Id.* at 50–52, 53–55, 56–59, 64–66, 69–70). Helsper requested a hearing. (*Id.* at 75). Administrative Law Judge Larry Meuwissen ("the ALJ") heard the matter on April 4, 2011. (*Id.* at 30–49, 132–134). On April 29, 2011, the ALJ issued a partially favorable decision. (*Id.* at 14–29). He concluded Helsper became disabled on December 1, 2010 and granted her application for SSI, but denied her application for SSDI. (*Id.* at 27–28). According to the ALJ, Helsper's insured status for purposes of SSDI expired on September 30, 2008, her date last insured ("DLI"). (*Id.* at 20). Because the ALJ concluded Helsper was not disabled until over two years after her DLI, Helsper was procedurally ineligible for SSDI benefits. 42 U.S.C. §§ 416(i), 423(c). In other words, Helsper's SSDI "coverage" expired on September 30, 2008.

The Appeals Council denied Helsper's request for a review of the ALJ's decision on December 1, 2010. (*Id.* at 2–4). The denial of further review rendered the ALJ's decision final. *See* 42 U.S.C. § 405(g); *Wilburn v. Astrue*, 626 F.3d 999, 1002 (8th Cir. 2010); *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005); *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992); 20 C.F.R. § 404.981. Helsper seeks judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

**B.      Plaintiff's Testimony**

As of the date of the hearing, Helsper was a forty-five-year-old woman. (*Id.* at 33). Her height was 5'2" and she weighed about 220 pounds, which she described as a normal weight for her. (*Id.* at 34). She was a graduate of technical college with four children, aged between fifteen and twenty-two. (*Id.* at 34, 36). All of Helsper's children and her boyfriend lived with her. (*Id.*

---

[4]      On reconsideration, Helsper alleged a slightly different set of impairments: (1) cervical spondylosis, (2) pain and muscle spasms in her back, neck, and arms, and (3) degenerative disease of her spine. (Admin. R. at 57).

at 34–35). Her most recent prior work was as a cook at an American Legion in 2008. (*Id.*). Before that, she worked about thirty hours per week as a cook at another restaurant. (*Id.*). Helsper testified that since the birth of her children, she had never held a full-time job. (*Id.*).

Helsper explained that she had surgery on the vertebrae in her neck in February 2008, and tried to go back to work "right away after the surgery." (*Id.* at 36–37, 38). Her pain became "worse and worse" after the surgery, however, and her physician told her not to work for about six months. (*Id.* at 37). To cope with the pain, Helsper stated she took Vicodin, Dilaudid, morphine, and other medications. (*Id.* at 38–39). She has also done rehabilitation and "been to every specialist they could find" seeking relief from her pain symptoms. (*Id.* at 38).

Helsper described her daily pain as an "eight" on a scale of one to ten. (*Id.* at 42). She spends most of the day in bed. (*Id.* at 39). Apart from the medications listed above, she uses a TENS machine[5] and heating pad to ease her pain. (*Id.* at 42-43). She has "good days" about two times a week, when she is able to have dinner with her family. (*Id.* at 43).

In terms of daily activities, Helsper stated that she did "very little" housework, cooking, cleaning, or shopping. (*Id.* at 39). She described her hobbies as swimming and reading. (*Id.* at 35). Helsper had a driver's license, but rarely drove because she could not turn her head to see past her shoulders and found driving "pretty scary." (*Id.* at 35). Three months before the hearing, she took a trip to visit her parents in Arizona, but had not done any other traveling. (*Id.* at 40–41). While in Arizona, Helsper did not do any sight-seeing. (*Id.* at 41).

---

[5] Transcutaneous electrical nerve stimulation (TENS) is a form of therapy used to treat some types of chronic pain that stimulates nerves near the aching joint and may interfere with the transmission of pain signals to the brain. Transcutaneous Electrical Nerve Stimulation, Mayo Clinic, http://www.mayoclinic.com/health/medical/IM01523 (last visited Feb. 4, 2013).

Aside from the pain related to her neck surgery, Helsper experiences trouble standing and walking because of her plantar fasciitis. (*Id.* at 39–40). She used to be able to walk around a pond near her home, but felt she could only walk a few blocks as of the date of the hearing. (*Id.* at 42).

### C. Medical Evidence

#### 1. Medical Records Prior to December 2010

According to the record, Helsper visited the doctor fourteen times between February and November 2007 to care for a burn sustained at work. (*Id.* at 197, 225, 351, 352–53, 354–55, 356–57, 358, 359–60, 361–62, 363–64, 365–66, 367–68, 369–70, 371, 373, 375). During that time, she never complained of neck or back pain, or a decline in her mood. (*Id.* at 23–26, 197, 225, 351, 352–53, 354–55, 356–57, 358, 359–60, 361–62, 363–64, 365–66, 367–68, 369–70, 371, 373, 375).

Helsper told her physicians her left-sided neck, shoulder, and arm pain began in November or December 2007. (*Id.* at 303–05, 554). She did not attribute the onset of the pain to any aggravating factors; rather, the record suggests Helsper woke up one morning with pain. (*Id.* at 303–05, 349, 554). She first visited Dr. Aubrey T. Schock ("Dr. Schock") regarding her left-sided pain on December 11, 2007. (*Id.* at 349–50). Helsper explained to Dr. Schock that her arm pain increased over the preceding three days. (*Id.* at 349). Although she had muscle spasms in her left neck and shoulder with pain radiating into her forearm, Helsper experienced no weakness and no pain in her neck or head. (*Id.*). During a physical exam, Helsper had good range of motion in her neck and normal results, except the muscles near her scapula were "very

tense and spastic."[6]  (*Id.* at 350).  Dr. Schock recommended icing, stretching, NSAIDs[7], and

analgesics[8].  (*Id.*).  She also referred Helsper to physical therapy and prescribed muscle relaxants

and an anti-inflammatory.  (*Id.*).

One week later, Helsper returned to Dr. Schock complaining of continued left neck and

scapular region pain.  (*Id.* at 347–48).  A physical examination revealed no weakness or

neurological symptoms. (*Id.* at 348).  Dr. Schock suspected nerve compression over the C6-C7

vertebrae on the left and prescribed muscle relaxants, Vicodin, and Prednisone[9].  (*Id.*).

On January 7, 2008, Helsper visited Dr. Schock again.  (*Id.* at 345–46).  She felt no

improvement in her condition, continuing to suffer from shoulder pain and left arm radiculopathy

with burning and numbness over the C6-C7 distribution.[10]  (*Id.* at 345).  She noted, however, that

steroids seemed to help relieve her discomfort.  (*Id.*).  Dr. Schock ordered an x-ray and an MRI

of the cervical region of Helsper's spine.  (*Id.*).  The x-ray revealed "mild straightening of the

normal cervical lordosis"[11] and "very slight degenerative spurring and narrowing" at the C4-C5

and C5-C6 disc spaces.  (*Id.* at 346, 381).  Otherwise, the results were negative.  (*Id.* at 381).

The MRI showed "[m]ild left and mild to moderate right foraminal narrowing at C5-C6 due to

---

[6]     The scapula are the large triangular bones lying over the ribs on the back.  *Stedman's Medical Dictionary*, Scapula (27th Ed. 2000).

[7]     An NSAID is a nonsteroidal anti-inflammatory drug, such as aspirin or ibuprofen. *Stedman's Medical Dictionary*, NSAID (27th Ed. 2000).

[8]     Dr. Schock's notes refer to "anagesics" (Admin. R. at 336, 350).  Based on the record, it appears these references are typographical errors or abbreviated references to analgesics. Analgesics are pain-relief medications.  *Stedman's Medical Dictionary*, Analgesic (27th Ed. 2000).

[9]     Prednisone is a steroid medication used to treat inflammation.  *Stedman's Medical Dictionary*, Prednisone (27th Ed. 2000).

[10]    Radiculopathy is a disorder of the spinal nerve roots.  *Stedman's Medical Dictionary*, Radiculopathy (27th Ed. 2000).  The chief symptoms are sensations of pain, tickling, tingling, burning, pricking or numbness; diminished or increased capacity for sensation; and motor or reflex disturbances.  *Stedman's Medical Dictionary*, Radicular Syndrome (27th Ed. 2000).

[11]    Cervical lordosis is the normal, convex curvature of the segment of the vertebral column at the base of the head.  *Stedman's Medical Dictionary*, Cervical lordosis (27th Ed. 2000).

mild uncovertebral joint hypertrophy and associated disc osteophyte complex"[12] and "[m]ild diffuse disc osteophyte complex at C6-C7 with left paracentral and foraminal annular tear." (*Id.* at 380).

Helsper visited Dr. Schock again on January 24, 2008. (*Id.* at 343–44). A recent cervical epidural injection did not provide her any relief. (*Id.* at 343). Results from a physical exam were normal except for tenderness along the trapezius and scapular region. (*Id.*). Helsper's neurological symptoms were normal except sensation was decreased near C6-C7. (*Id.*). Dr. Schock concluded Helsper suffered a C6-C7 herniation with nerve impingement and noted pain control was an issue. (*Id.*). She refilled Helsper's prescriptions for Prednisone and Oxycontin[13], and ordered another epidural injection. (*Id.*).

Helsper received the epidural cervical injection on January 28, 2008. (*Id.* at 378). One week later, she attended a follow-up appointment with Dr. Schock. (*Id.* at 341–42). Dr. Schock referred Helsper to Dr. Wylie Hung Zhu ("Dr. Zhu"), a neurosurgeon, when Helsper complained that her left arm and upper back pain symptoms were not improving. (*Id.*).

Helsper visited Dr. Zhu in mid-February 2008. (*Id.* at 302, 303–05 383). Her upper spine range of motion was restricted, but a neurological exam revealed "grossly normal results." (*Id.* at 304, 383). Dr. Zhu concluded Helsper had cervical spondylosis with radiculopathy. (*Id.* at 304). He opined that she would ultimately require surgery, but Helsper opted to undergo two weeks of physical therapy before resorting to surgery. (*Id.*).

---

[12] Hypertrophy is the general increase in bulk of a body part or organ. *Stedman's Medical Dictionary*, Hypertrophy (27th Ed. 2000). Osteophyte complex refers to a bony outgrowth or protuberance. *Stedman's Medical Dictionary*, Osteophyte (27th Ed. 2000).

[13] OxyContin is a time-released form of Oxycodone. Oxycodone (Oral Route), Mayo Clinic (Dec. 1, 2012), http://www.mayoclinic.com/health/drug-information/DR603249. Oxycodone is a narcotic pain medication often combined with aspirin or acetaminophen. *Stedman's Medical Dictionary*, Oxycodone (27th Ed. 2000).

Helsper returned to Dr. Zhu when physical therapy failed to relieve her symptoms. (*Id.* at 302–03). At that time, Helsper continuously raised her arm to alleviate her pain and radiculopathy. (*Id.*). Given her "significant symptoms," Dr. Zhu recommended surgical decompression surgery, which he performed in late February 2008. (*Id.* at 302, 303–06, 337–40).

Following her surgery and subsequent improvement in her left arm pain and the numbness and tingling in her fingers, Helsper returned to work. (*Id.* at 309, 316, 335–36). At an April 11, 2008 post-operation checkup, Helsper complained of neck pain and left arm tingling, but her motor strength rated at "5/5" and her sensation was intact. (*Id.* at 307–08). The nurse practitioner advised Helsper to begin physical therapy for core strengthening. (*Id.* at 308). She also instructed Helsper to "[r]eturn to light work duty," starting by lifting ten pounds and increasing weight by five pounds every week. (*Id.* at 306, 308). Helsper believed she began lifting too early, increasing her pain and, ultimately, causing her to discontinue physical therapy and work on May 22, 2008. (*Id.* at 196, 316, 335).

On June 4, 2008, Helsper returned to Dr. Schock for her persistent pain. (*Id.* at 335–36). Helsper explained she "[w]as making good strides" following surgery until the preceding weekend when she noticed increased tension in her neck and shoulder. (*Id.* at 335). A physical exam yielded normal results, except for left-sided tenderness over her neck and scapular regions. (*Id.*). Helsper "did a fair am[oun]t of grimacing" during a physical exam, but no radiculopathy symptoms were noted and she had good range of motion in her shoulder girdle. (*Id.*). Dr. Schock noted mild to moderate stiffness and decreased range of motion only in Helsper's neck flexion. (*Id.*). She concluded Helsper's current condition was a "temporary set back" and

instructed her to work on stretching, icing, and taking the prescribed muscle relaxants, analgesics, and steroids. (*Id.* at 336).

Five days later, Helsper returned for a follow-up appointment regarding her pain. (*Id.* at 333–34). She reported feeling slightly better with her medications and had no complaints of new weakness or neurological symptoms. (*Id.*). Again, a physical exam yielded normal results except for tenderness over Helsper's C4-C5 region. (*Id.*). Dr. Schock observed Helsper's range of motion was slow, but almost full. (*Id.*). She opined that a strain caused Helsper's symptoms and instructed her to ice the area and continue the present medications as needed. (*Id.*).

Helsper visited the hospital on June 11, 2008 complaining of a headache. (*Id.* at 332). Despite "a long-standing history of headaches," Helsper believed the issues with her neck "may have been somewhat related to this headache." (*Id.*). She was given medication to prevent nausea and morphine, and sent home. (*Id.*).

On July 3, 2008, a second MRI was taken of Helsper's cervical spine to compare it to her pre-operative imaging. (*Id.* at 376). The July 2008 MRI revealed post-operative changes at the C5-C6 and C6-C7 levels. (*Id.* at 376–77). The herniation present in earlier imaging was no longer appreciated, but there was "some mild enhancement along the margins of the disc in the left foraminal zone" and "a very mild residual broad-based disc bulge in the left paracentral and foraminal zone." (*Id.* at 376). There was not central canal stenosis or foraminal stenosis. (*Id.*). At the C5-C6 level, the MRI revealed "mild to moderate right and mild left foraminal narrowing." (*Id.* at 376–77).

Two weeks later, Helsper returned to Dr. Zhu to follow up regarding her symptoms since the surgery. (*Id.* at 301–02). Her strength and sensation remained normal. (*Id.* at 301). Dr. Zhu concluded Helsper suffered from an "[a]cute exacerbation of spondylosis with neck pain."

(*Id.* at 301). He recommended an epidural steroid injection at C6-C7 followed by physical therapy. (*Id.*). He also instructed Helsper to "stay away from work and focus on rehabilitation and resolution of her symptoms" and provided a certified note stating she was "unable to return to work [until] seen again in 4 weeks." (*Id.* at 301–02, 310).

On August 13, 2008, Helsper met with Dr. Schock to address her concerns about Dr. Zhu's diagnosis and questions about physical therapy. (*Id.* at 328). Specifically, Helsper "wanted to know is her disability and what degeneration of spine means." (*Id.*). Neurological and physical exams were normal, except Helsper's neck appeared "mildly stiff" and she had a decreased range of motion in flexion and extension. (*Id.*). Dr. Schock recommended stretching and passive therapy, and then strength training to improve Helsper's range of motion. (*Id.* at 328–29).

About two weeks later, Helsper had a follow-up appointment with Dr. Zhu. (*Id.* at 300–01). Dr. Zhu opined that the physical therapy Helsper received "might have been somewhat more aggressive than we had intended for" and found "her symptoms [we]re not actually getting any better." (*Id.* at 300). He advised her to get another epidural steroid injection, attend physical therapy with a different provider, and consult that provider regarding proper treatment with heat, ultrasound, stretching, and a TENS unit. (*Id.*). He assured her that there were no structural issues and she would likely improve with appropriate therapy. (*Id.*).

Dr. Schock saw Helsper again on January 7, 2009, for complaints of ear pain. (*Id.* at 324–25). She observed good range of motion in Helsper's shoulder girdle, but poor range of motion in her neck and stiffness. (*Id.* at 325). About a week later, Helsper saw Kristine Spiewak

("Spiewak") at Sister Kenny Rehabilitation Associates.[14]  (*Id.* at 399–400).  Helsper rated her

pain as "moderate," meaning it was "[a]ggravating, [g]rueling, [u]psetting, [f]rustrating" and

explained that her goal was "[t]o not have pain 24/7"  (*Id.* at 315, 316).  Spiewak noted that

Helsper's symptoms remained the same for the past two months, but she experienced more pain

in left arm.  (*Id.* at 400).  Helsper reported tingling in the pointer finger of her left hand, but no

true numbness, and pain in her neck "every time she moves."  (*Id.* at 401).  Helsper's ability to

move her head was limited, but she noted that trigger point injections helped.  (*Id.* at 400).

Helsper complained of left-sided ear pain, which had been present since she woke up from

surgery.  (*Id.*).  Spiewak observed that Helsper tried to perform some of the exercises learned in

physical therapy, "but it d[id] not sound as though she ha[d] done a rigorous home program."

(*Id.*).  Helsper walked on the treadmill and tried to walk the dog, but reported she feared falling

because she could not look down to see ice or other obstacles.  (*Id.* at 400).  She reported using

Vicodin one to two times per week, but when her pain was very severe, she would take up to

three Vicodin and Flexeril in one day.  (*Id.* at 400–01).

Helsper opted to stand and walk around the room during her appointment, stating she

suffered more pain when she sat.  (*Id.* at 401).   A physical exam revealed limited mobility of

Helsper's cervical spine, causing her to turn her whole body when trying to turn her head.  (*Id.*).

Nevertheless, her cervical flexion was a bit improved, lacking about 30%; full extension, rotation

to her left was about 60% of normal; and rotation to right was about 70% of normal.  (*Id.*).

---

[14]     A notation from the January 2009 visit states Helsper was last seen in the clinic on
November 18, 2008.  (*Id.* at 399).  Documentation of that visit is not contained in the record, but
the visit is noted here because of the comparison Spiewak makes regarding the development of
Helsper's symptoms.  (*Id.* at 399–400).  Spiewak's notes also state Helsper was discharged from
physical therapy on December 23; again, there are no records of the corresponding physical
therapy sessions.  (*Id.* at 400).  Nevertheless, Spiewak stated "[o]verall it appears that [Helsper]
improved her range of motion at her cervical spine and her joints, but her symptoms did not
improve with physical therapy visits."  (*Id.*).

Helsper complained of diffuse tenderness throughout her upper back, but Spiewak detected only one taut muscle there. (*Id.*). Helsper's right upper back and arms were not as tender, but a few points on her left chest caused pain. (*Id.*). Helsper had full range of motion in her upper extremities, including her shoulders. (*Id.*). Her strength was "5/5 throughout all muscle groups of her upper extremities" and her muscle tone was normal. (*Id.*). Speiwak concluded Helsper suffered from muscle spasms with muscle pain and continued weakness at shoulder girdles. (*Id.*) Speiwak noted three full trials of physical therapy failed to improve her pain, but acknowledged Helsper has not been consistent with following through with a home exercise program and was not currently participating in one. (*Id.* at 401–02). Speiwak provided a TENS unit for home use and recommended limited use of trigger point injections. (*Id.* at 402).

On February 23, 2009, Helsper followed-up with Spiewak regarding her neck pain. (*Id.* at 405–07). Again, she found standing during the appointment "much more comfortable" than sitting. (*Id.* at 407). Helsper reported the TENS unit was effective for her, but she continued to have a hard time finding a place to get comfortable. (*Id.*). She had a full range of motion and strength in her upper extremities, but reduced cervical extension and lateral rotation. (*Id.* at 407). Spiewak noted Helsper improved her shoulder strength, but her symptoms otherwise remained about the same. (*Id.*) She also noted that Helsper "continue[d] to be inconsistent with following through on her home exercise program." (*Id.*). Concluding conservative treatments failed, Spiewak recommended Helsper return to Dr. Zhu. (*Id.*).

On March 3, 2009, Helsper saw Dr. Schock for low back pain. (*Id.* at 322, 430–31). Dr. Schock observed Helsper was in "mild to moderate pain" and concluded she suffered a lumbar strain. (*Id.*). Dr. Schock recommended rest, heat, pain relievers, and muscle relaxants. (*Id.*).

She and Helsper also discussed a long-term treatment plan, including the use of NSAIDS and home exercises. (*Id.*).

In mid-March, Helsper completed an Adult Disability Report and an Adult Function Report. (*Id.* at 195–202, 203–11). She reported she could walk "OK," but could sit for about ten minutes or stand for about an hour before her neck, shoulder, and left arm began to hurt. (*Id.* at 196). She said she was unable to lift much more than five pounds and her kids helped her carry anything around the house and did all of the household chores. (*Id.*). Helsper stated she had pain every day in neck, shoulder, and left arm. (*Id.*). Helsper also described her typical day. (*Id.* at 204). She explained that she began each day by letting her dog out, seeing her kids off to school, and caring for herself (brushing her teeth, combing her hair, and washing up). (*Id.*). Then, she picked up living room and kitchen before lying down for sixty to ninety minutes. (*Id.*) When she woke, Helsper would soak her back and neck in a hot tub and then take her dog on a fifteen to thirty minute walk with dog, eat lunch, and lie down for about sixty minutes. (*Id.*). When her children arrived, she would help with homework, fold laundry, try to help prepare dinner, and go for another walk or lie down. (*Id.*). Finally, she would eat dinner, watch television, let her dog out, and go to bed. (*Id.* at 430). She was able to prepare basic meals, bathe, and dress herself, but required some help occasionally. (*Id.* at 205).

Helsper returned to Dr. Schock on June 3, 2009, approximately three-and-half months after her last visit, for a follow-up appointment regarding her neck pain. (*Id.* at 410–13). Helsper stood throughout the appointment. (*Id.* at 412). Helsper reported experiencing the same pain she suffered from in the past year and explained it "really ha[d] not changed." (*Id.* at 411). She denied new numbness or weakness. (*Id.*). Helsper did some walking for exercise, but was not on a home exercise program through physical therapy. (*Id.*). Dr. Schock assessed chronic

neck pain with diffuse muscle pain throughout Helsper's upper back and lower cervical spine. (*Id.* at 412).  She noted Helsper had no "good improvement in pain despite physical therapy and multiple medications" in the several months since the surgery.  (*Id.*).  She also noted Helsper was "inconsistent in following through with her home exercise program."  (*Id.*).  Dr. Schock recommended Helsper increase her medications, return to Dr. Zhu, and visit a pain clinic to receive a chronic pain management program.  (*Id.*).  The next day, Helsper returned to have her pain medications refilled and complained of "very disabling" pain and stiffness in her left neck and shoulder.  (*Id.* at 436).  On April 27, April 28, and July 2, Helsper arrived at the hospital complaining of headaches.  (*Id.* at 431–34, 434–35, 439).

According to a letter from Sarah Wagner ("Wagner"), a licensed psychology professional, Helsper was diagnosed with depressive disorder not otherwise specified on July 7, 2009.  (*Id.* at 514).  Following that diagnoses, Helsper was seen on a weekly basis.  (*Id.*).

In a disability report Helsper completed in mid-July on appeal of the denial of her initial request for benefits, Helsper explained her condition had worsened since her March 2009 disability report due to "more and more migraines" and difficulty she now had sitting.  (*Id.* at 232–33).  Helsper reported "[m]ost of the time can care for my personal needs," but her live-in fiancé and children completed most of the cooking, cleaning, laundry, and shopping.  (*Id.* at 236).

On July 22 and September 18, Helsper received four trigger point injections to help control her neck pain.  (*Id.* at 441–43, 503–05).  Helsper returned on September 21 "[n]ear crisis" due to her pain.  (*Id.* at 501).  She received morphine and an anti-neusea medication before she was sent home.  (*Id.* at 501–03).

On October 12, 2009, Dr. Schock administered "about 10–12 [s]eparate trigger point injections" when Helsper complained of neck pain. (*Id.* at 498–99). Helsper reported feeling "she ha[d] exhausted all medical help." (*Id.* at 497). She did not return to Dr. Schock until April 9, 2010, about seven months after her October visit. (*Id.* at 495). According to Helsper, her symptoms had not changed. (*Id.*). She continued to have daily neck and shoulder pain with intermittent numbness and weakness in her arms. (*Id.*). Helsper states that none of the various therapeutic regimens she had been on—medical, non-medical, or psychological—helped her. (*Id.* at 495). She "only want[ed] muscle relaxants and . . . short acting narc[otic]s." (*Id.*). During a physical exam, Helsper refused to sit and appeared "very stiff." (*Id.* at 494). In addition, Dr. Schock noted her mood and affect appeared depressed and Helsper cried regularly. (*Id.* at 495). Dr. Schock encouraged Helsper "to continue to work in earnest" and recommended she return in three to four weeks or sooner, if needed. (*Id.* at 496).

Helsper returned four weeks later and stated she was no longer interested in pursuing traditional medical therapy, including psychiatric help. (*Id.* at 493). Dr. Schock advised her to stay active, refilled her narcotics and muscle relaxant, and recommended a recheck in four to six months or earlier, as needed. (*Id.* at 492–93).

Over a year later, on July 23 and August 8, 2010, Helsper returned to Dr. Schock complaining of pain. (*Id.* at 483–84, 484–86). Helsper's neck was very stiff and she reported she felt better keeping her right arm raised. (*Id.* at 486). Dr. Schock referred Helsper to therapy; prescribed steroids, pain medication, icing, and stretching exercises; and instructed Helsper to return. (*Id.* at 484).

On September 16, 2010, Helsper began individual therapy sessions with Laraine Walker ("Walker"). (*Id.* at 474–75). Her symptoms included "depressed mood, sadness and irritability, anxious mood, excessive worry, fatigue/low energy, impaired concentration," and blaming herself for her medical problems. (*Id.* at 477). Walker concluded Helsper had "moderate symptoms of depression" and diagnosed her with "Major Depression, Recurrent, Moderate" and dysthymic disorder.[15] (*Id.* at 475, 477). The following week, Helsper was "very sad, [and] often in tears" due to a family issue. (*Id.* at 473). She and Walker developed treatment goals and continued to meet weekly. (*Id.* at 472–73). A letter from one of Helsper's therapists stated she "struggle[d] to find motivation to get out of bed each day" and fe[lt] hopeless about recovering from the physical pain she experience[d]."[16] (*Id.* at 515).

On November 8, 2010, Helsper was referred to another organization for individual therapy with Daniel Johnson, PsyD ("Johnson"). (*Id.* 615–20). She met with Johnson twice before the end of the month and continued to report a depressed mood, moderate anxiety, and chronic pain. (*Id.* at 611–12, 613–14). At the end of the month, Helsper returned to Dr. Schock for six trigger point injections. (*Id.* at 596–97). Dr. Schock noted that Helsper was "currently mostly disabled." (*Id.* at 596).

### 2. State Agency Medical Consultants' Opinions

Dr. Anselmo G. Mamaril ("Dr. Mamaril") reviewed Helsper's medical records and assessed her impairments and functioning on May 21, 2009. (*Id.* at 383, 385–92, 393–95). Dr. Mamaril completed a Physical Residual Functional Capacity ("RFC") Assessment based on his

---

[15]     Dysthmic disorder is a chronic disturbance of mood characterized by mild depression or loss of interest in usual activities. *Stedman's Medical Dictionary*, Dysthmic disorder (27th Ed. 2000).

[16]     The letter is undated; however, Helsper's attorney submitted it to the ALJ attached to a cover letter dated September 30, 2010. (*Id.* at 513).

findings and concluded Helsper was capable of light work. (*Id.* at 385–92). The primary diagnosis identified was degenerative disc disease of the cervical spine post-surgery. (*Id.* at 385). Dr. Mamaril noted that Helsper suffered from severe degenerative disc disease at her cervical spine before and after her DLI. (*Id.* at 383). Nevertheless, he found that after her surgery, her condition improved, she was released to light duty, and she had no neurological deficits. (*Id.*). He cited Helsper's own reports of completing light household chores, walking, and riding in a car. (*Id.*). Dr. Mamaril concluded Helsper's condition did not create appreciable limitations for her under the terms of a light RFC. (*Id.* at 383, 385–92).

On September 1, 2009, Dr. Dan Larson ("Dr. Larson") reviewed Helsper's file and Dr. Mamaril's assessment on reconsideration. (*Id.* at 447–49). Dr. Larson identified the following conditions: (1) neck pain; (2) cervical spondylosis; (3) chronic muscle spasms in back, neck and arms; and (4) degenerative disease of spine. (*Id.* at 447). Dr. Larson affirmed Dr. Mamaril's assessment as written. (*Id.* at 448). In doing so, Dr. Larson agreed with the light RFC Dr. Mamaril assigned to Helsper. (*Id.*).

### D. Evidence from the Vocational Expert

Jesse R. Ogren ("Ogren") testified as a vocational expert ("VE") at the hearing before the ALJ. (*Id.* at 43–48). Ogren has a M.S. in Vocational Rehabilitation Counseling and Education from University of Wisconsin-Stout. (*Id.* at 146). He is a certified rehabilitation counselor. (*Id.*).

Before the ALJ commenced his examination of Ogren, the ALJ asked Helsper and Ogren some clarifying questions about her past work experience. (*Id.* at 43–45). Ogren noted that Helsper was a warehouse worker in 1996, and worked as a cashier in a liquor store from 1991 to

2001. (*Id.* at 43–44). Helsper then stated that she worked as a chair lift operator at a downhill ski facility, but did not specify the timeframe of that job. (*Id.* at 44).

Despite these varied work experiences, Ogren stated that Helsper's primary prior work category was as a cook (DOT 313.374-014), a job Ogren described as a semi-skilled, light exertional level position. (*Id.* at 44). The ALJ asked Helsper about her experience as a cook, and Helsper stated that she regularly lifted heavy weights, including garbage cans, pots of boiling water, and containers of food. (*Id.* at 44–45). Hearing this, Ogren revised his assessment of the cook position, stating that he would classify it as medium exertional level based on the lifting Helsper described. (*Id.* at 45).

The ALJ asked Ogren to consider a hypothetical younger person with a high school or better education, and no difficulties with communication. (*Id.* at 46). The ALJ stated that the hypothetical person would have an RFC for light work, but would not work with ropes, ladders, or scaffolds, and would be limited to occasional balancing, stooping, kneeling, crouching, and crawling. (*Id.*). In addition, the hypothetical person would be limited to occasional over-the-shoulder reaching and would avoid hazardous machinery and unprotected heights. (*Id.*). Ogren testified that a person with those restrictions would be capable of performing the cashier position. (*Id.*). Further, Ogren concluded such an individual could be a hand packager (DOT 559.687-074), assembler (DOT 783.687-010), or garment bagger (DOT 920.687-018). (*Id.* at 46). Ogren stated that there are 7,000 hand packaging jobs in Minnesota, 11,000 assembly jobs, and 3,000 garment bagging jobs. (*Id.*).

The ALJ then modified his hypothetical, such that the employee would be limited to sitting or standing only thirty to sixty minutes without interruption, walking twenty to thirty minutes without interruption, sitting six hours per day, standing five hours per day, and walking

three hours per day.  (*Id.*).  Ogren stated that each of the jobs he listed in the first hypothetical would still be available.  (*Id.*).

The ALJ then further modified his hypothetical, reducing sitting hours to no more than five per day, standing hours to no more than four per day, and walking no more than two hours per day.  (*Id.* at 47).  Ogren noted that this set of restrictions would no longer qualify as light exertional level work, but that the three job categories he listed would still be available because they are each capable of being performed at a bench.  (*Id.*).

The ALJ modified his hypothetical once again, limiting use of the left upper extremity, but leaving the right upper extremity unlimited, in a situation where the hypothetical employee was right-hand dominant.  (*Id.*).  Ogren stated that because the hypothetical employee had no restrictions on the dominant hand, the hand packaging, assembly, and garment bagging positions would all still be available.  (*Id.*).

Next, the ALJ asked Ogren if sedentary work would be available to the hypothetical person he described.  (*Id.* at 48).  Ogren listed information clerk (DOT 237.367-0146), surveillance systems monitory (DOT 379.367-010), and laminator (DOT 690.685-258), as possible occupations for the hypothetical employee requiring sedentary work.  (*Id.*).  Ogren estimated there to be about 4,000 information clerk, 4,500 surveillance systems monitor, and 1,500 laminator jobs in Minnesota.  (*Id.*).  Ogren testified that his assessments came from the Dictionary of Occupational Titles, apart from the ALJ's second hypothetical, for which he used some of his own knowledge and training.  (*Id.*).

Helsper's attorney then asked Ogren about a situation where an employee is absent from work one day a week because of pain. (*Id.*). Ogren responded that in most cases, an employer would not tolerate such absences. (*Id.*). He opined that employers only tolerate two absences, tardy arrivals, and/or extended breaks per month. (*Id.*).

### E.      The ALJ's Decision

On April 29, 2011, ALJ Meuwissen issued a decision denying SSDI benefits because Helsper was not disabled prior to her DLI, but finding that Helsper was disabled beginning on December 1, 2010 and qualified for SSI as of that date. (*Id.* at 18–29). To draw these conclusions, the ALJ employed the required five-step evaluation considering: (1) whether Helsper was engaged in substantial gainful activity; (2) whether Helsper had severe impairments; (3) whether Helsper's impairments met or equaled impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether Helsper was capable of returning to past work; and (5) whether Helsper could do other work existing in significant numbers in the regional or national economy. *See* 20 C.F.R. § 416.920(a)–(f).

At the first step of the evaluation, the ALJ found Helsper had not engaged in substantial gainful activity since her AOD of December 9, 2007.[17] (Admin. R. at 20). At the second step, the ALJ found Helsper had the following severe impairments: (1) cervical degenerative disc disease; (2) obesity; (3) an affective disorder. (*Id.* (citing 20 C.F.R. §§ 404.1520(c), 416.920(c))). At step three, consistent with the opinions of the State Agency Medical Consultants, the ALJ determined Helsper did not have an impairment or combination of

---

[17]      The ALJ noted Helsper worked after the alleged onset date, but concluded that "work activity did not rise to the level of substantially gainful activity because hear earnings for all of 2008 totaled only $553.86. (Admin. R. at 20, 184).

impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525–1526, 416.920(d), 416.925–926). (*Id.* at 13–14).

At step four of the evaluation, the ALJ was required to consider Helsper's subjective complaints as well as objective medical evidence. (*Id.* at 21–26). First, the ALJ found that although there was some degree of pain or limitation stemming from Helsper's medically established impairments, the medical record did not support the alleged degree of pain or limitation. (*Id.* at 22–23). Also, the ALJ found the asserted persistence and severity of Helsper's subjective complaints regarding the intensity, persistence, and limiting effects of her symptoms were unsubstantiated by objective medical findings and, therefore, not credible. (*Id.*). Considering the record as a whole, the ALJ concluded Helsper's claims of the limiting effects of her symptoms were not credible to the extent they were inconsistent with a sedentary RFC, with some additional limitations prior to December 1, 2010. (*Id.*). The ALJ found Helsper's limitations became disabling on December 1, 2010 and included a discussion of Helsper's RFC before and after that date. (*Id.* at 21–26).

The ALJ found that prior to December 1, 2010, Helsper had a sedentary RFC, subject to the following conditions: no climbing of ropes, ladders, or scaffolds; no work involving more than occasional balancing, stooping, kneeling, crouching, and crawling; no work involving more than occasional reaching above the level of her shoulder; no work around hazardous machinery or at unprotected heights; no sitting or standing for more than sixty minutes at a time without interruption; no walking for more than thirty minutes without interruption; no sitting for more than five hours in an eight-hour workday; no standing for more than about three hours in an eight-hour workday; no walking for more than about two hours in an eight-hour workday. (*Id.* at 22). The ALJ also determined Helsper could perform no more than occasional work-related

reaching activities, using her non-dominant left upper extremity; he noted explicitly, however, that Helsper was "able to reach, using her dominant right upper extremity, on a continuous basis." (*Id.*). The ALJ concluded that prior to December 1, 2010 (1) the objective medical evidence and treatment record was inconsistent with either impairments of such severity or symptoms of any intensity, frequency, or duration which would require greater RFC reductions; (2) the medical records were inconsistent with a conclusion of disability; and (3) Helsper's independent self-care, daily activity, and other factors did not support the need for further RFC considerations. (*Id.* at 22–23).

Regarding Helsper's RFC prior to December 1, 2010, the ALJ gave the greatest weight to Dr. Mamaril's May 2009 physical RFC assessment, which concluded Helsper was capable of exertionally light work, albeit with additional postural, manipulative, and environmental limitations. (*Id.* at 23). The ALJ decreased the exertional capacities to be consistent with the record as a whole. (*Id.*). The ALJ specifically cited the following records in reducing Helsper to sedentary work: medical imaging from July 2008; Helsper's own function report from March 2009; and treating source statements from April 2008, July 2008, and March 2009. (*Id.*). These records medically document Helsper's status following her February 2008 surgery, her work release following surgery and the corresponding lifting restriction imposed, and imaging showing no evidence of recurrent disc herniation. (*Id.*). The records also reflect normal neurological findings, including strength and sensory function within normal limits. (*Id.*) Finally, the records include Helsper's personal reports that she was "doing well" and capable of light household chores, getting around, walking, riding in cars, and shopping. (*Id.* at 23, 301, 316). Regarding Helsper's alleged mental impairments, the ALJ found few treating mental health records prior to December 1, 2010, but noted a September 2010 report from Wagner. (*Id.*

at 23).  The ALJ afforded Wagner's opinion less weight because he found it was generally inconsistent with the record evidence, including Helsper's own statements.  (*Id.*).

After December 1, 2010, the ALJ concluded Helsper had a sedentary RFC, subject to all of the additional limitations listed above and, in addition, that she was unable to perform work involving more than occasional reaching above the level of her shoulder with both arms, no more than occasional reaching using her non-dominant left upper extremity, and reaching on a continuous basis using her dominant right upper extremity.  (*Id.* at 23).  The ALJ further found that after December 1, 2010, Helsper was unable to perform work that at higher than an entry-level position and involved more than routine, repetitive tasks and instructions.  (*Id.* at 24).  He also concluded that Helsper's work could not require "sustained work-related physical and mental activities in a work setting on a regular and continuing basis, that is, [eight] hours a day, [five] days a week, or an equivalent schedule."  (*Id.*).  In reaching this conclusion, the ALJ noted that Helsper remained symptomatic, despite undergoing surgery and being prescribed a wide range of medications.  (*Id.*).  He found Helsper's allegations regarding her symptoms were generally credible as of December 1, 2010 to the extent they were consistent with the record as a whole.  (*Id.*).  Specifically, the ALJ cited three sources: (1) a December 7, 2010 report prepared by Dr. Dustin Warner ("Dr. Warner"), a consultative psychological examiner; (2) a January 3, 2011 opinion report prepared by Dr. Ward Jankus ("Dr. Jankus"), the consultative medical examiner; and (3) the January 2011 treating source opinions.  (*Id.*).

The ALJ accorded significant weight to the reports from Dr. Warner and Dr. Jankus.  In early December 2010, Dr. Warner opined

> [a]t the present time, the claimant's mental capacity is such that she can understand, remember and follow simple instructions.
>
> Her attention and concentration skills are such that she could carry out routine and repetitive work with reasonable pace and persistence.  She would respond best to brief and superficial contact with coworkers and supervisors.  She would tolerate minimal stress and pressure found in entry-level workplace.

(*Id.* (quoting *id.* at 548–49)).  In early January 2011, Dr. Jankus opined that Helsper could lift no more than "maybe [ten] to [twenty] pounds occasionally, maybe [ten] pounds more frequently using both arms together with the understanding that it is going to be done mostly using the right, asymptomatic arm to support the object and the left one more just to help stabilize it."  (*Id.* at 25 (quoting *id.* at 558)).  He found it was "reasonable that she not be expected to do any type of repetitive or highly forceful pushing and pulling" or prolonged overhead activities on the left.  (*Id.*).  He also found Helsper likely could not stand more than thirty to sixty minutes at a time or sit more than four to six hours without a break.  (*Id.*).  Finally, the ALJ concluded the post-December 1, 2010 RFC assessment was further corroborated by subsequent medical records and Helsper's own testimony at the hearing, which established additional pain medication prescriptions, Helsper's inability to perform household chores and difficulty finding a comfortable position, and the likelihood of another surgery to relieve her pain symptoms.  (*Id.* at 26).

The ALJ also noted Helsper's increased depression after December 1, 2010.  (*Id.* at 24–25).  By early December 2010, Helsper's depression caused her to have low energy, sleep disruption, and low self-esteem.  (*Id.* at 24).  She did not spend much time outside of her home, stopped performing household chores, and received diagnoses depression ranging from

depressive disorder and dysthymic disorder to major depressive disorder.[18]  (*Id.*).  Helsper's physicians observed that she appeared physically rigid, suffered situational anxiety, and her affect was blunted and mood depressed.  (*Id.*).  Dr. Warner assessed her with a Global Assessment of Functioning Score of 50.  (*Id.*).  The ALJ also cited January 2011 opinions from treating sources, who noted that Helsper suffered with moderate problems in social functioning and interpersonal functioning, and had severe problems in self-care and independent living.  (*Id.* at 25).

At step five, the ALJ determined Helsper was unable of performing any past relevant work after December 1, 2010, including her job as a warehouse worker or a cashier, because the positions exceeded the RFC assessment.  (*Id.* at 26).  The transferability of Helsper's job skills was immaterial to the disability determination because the DOT describes her past relevant work experience as unskilled.  (*Id.* at 27).  The ALJ concluded, however, that prior to December 1, 2010 there were jobs existing in the national economy that Helsper was able to perform.  (*Id.* at 27).  The ALJ based his determination on the testimony of the VE and the VE's written submissions, and agreed that Helsper was capable of performing sedentary work until December 1, 2010.  (*Id.* at 26-27).  Accordingly, the ALJ concluded that Helsper was not disabled as defined in 20 C.F.R. § 404.1520(f) and 416.920(f) until more than two years after her DLI (September 30, 2008).  (*Id.* at 27–28).

_____

[18]    Major depressive disorder is a mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness.  *Stedman's Medical Dictionary*, Major depression (27th Ed. 2000).  Diagnostic criteria (DSM-IV) for a major depressive episode include a depressed mood, a marked reduction of interest or pleasure in virtually all activities, or both, lasting for at least 2 weeks.  *Id.*  In addition, 3 or more of the following must be present: gain or loss of weight, increased or decreased sleep, increased or decreased level of psychomotor activity, fatigue, feelings of guilt or worthlessness, diminished ability to concentrate, and recurring thoughts of death or suicide.  *Id.*

## II.     STANDARD OF REVIEW

The standards governing the award of Social Security disability benefits are congressionally mandated: "[t]he Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992). "Disability" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(2)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy." *Id.*

### A.     Administrative Review

If a claimant's initial application for benefits is denied, he may request reconsideration of the decision. 20 C.F.R. §§ 404.909(a)(1), 416.1409(a). A claimant who is dissatisfied with the reconsidered decision may seek an ALJ's administrative review. 20 C.F.R. §§ 404.929, 416.1429. If the claimant is dissatisfied with the ALJ's decision, then review by the Appeals Council may be sought, although that review is not automatic. 20 C.F.R. §§ 404.967–.982, 416.1467. If the request for review is denied, then the ALJ's decision is final and binding upon the claimant unless the matter is appealed to a federal district court. An appeal to a federal court of either the Appeals Council or the ALJ's decisions must occur within sixty days after notice of the Appeals Council's action. 42 U.S.C. § 405(g); 20 C.F.R. §§ 404.981, 416.1481.

## B.        Judicial Review

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive. 42 U.S.C. § 405(g). This Court's review of the Commissioner's final decision is deferential because the decision is reviewed "only to ensure that it is supported by 'substantial evidence in the record as a whole.'" *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) (quoting *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002)). A court's task is limited to reviewing "the record for legal error and to ensure that the factual findings are supported by substantial evidence." *Id.*

The "substantial evidence in the record as a whole" standard does not require a preponderance of the evidence but rather only "enough so that a reasonable mind could find it adequate to support the decision." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). Yet, this Court must "consider evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000). Thus, a "notable difference exists between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989) (internal citation omitted).

> "Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis. In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* (internal citation omitted).

In reviewing the ALJ's decision, this Court analyzes the following factors: (1) the ALJ's findings regarding credibility; (2) the claimant's education, background, work history, and age; (3) the medical evidence provided by the claimant's treating and consulting physicians; (4) the

claimant's subjective complaints of pain and description of physical activity and impairment; (5) third parties' corroboration of the claimant's physical impairment; and (6) the VE's testimony based on proper hypothetical questions that set forth the claimant's impairments fairly. *Brand v. Sec'y of the Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980). Proof of disability is the claimant's burden. 20 C.F.R. § 404.1512(a). Thus, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

Reversal is not appropriate "merely because the evidence is capable of supporting the opposite conclusion." *Hensley*, 352 F.3d at 355. If substantial evidence on record as a whole permits one to draw two inconsistent positions and one of those represents the Commissioner's findings, then the Commissioner's decision should be affirmed. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). This Court's task "is not to reweigh the evidence, and [the Court] may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [the Court] would have decided the case differently." *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

## III.    DISCUSSION

Construing Helsper's *pro se* Motion liberally, she challenges the ALJ's conclusion that she was not disabled prior to December 1, 2010 for two reasons.[19] First, Helsper contends the

---

[19]     Helsper's *pro se* Motion states the VE testified she was capable of performing "representative occupations such as <u>Laminator</u>." (Pl.'s Mot. for Summ. J. at 1) (emphasis in original). The Commissioner narrowly construed this statement as a challenge only to the VE's opinion that Helsper could perform the work of a laminator prior to December 1, 2010. (Def.'s Mem. in Supp. of Mot. for Summ. J. at 12). The Court construes Helsper's Motion more broadly, as a challenge to the VE's opinion that she was not disabled prior to December 1, 2010. Nevertheless, the Court notes agreement with the Commissioner that, to the extent Helsper's

hypothetical question posed to the VE failed to consider the negative effect the use of her right arm would have on her left arm. Specifically, Helsper asserts "it is beyond reasonable expectation to repetitively use right [sic] arm for 8 hours each day, 5 days a week, without it affecting the left side." (Pl.'s Mot. for Summ. J. at 1). Second, she argues, more generally, that her "additional limitations" prior to December 1, 2010, including restrictions on standing, sitting, and walking, "add to the impossibility of maintaining" the vocations cited by the VE. (*Id.*). The Court independently reviewed the record and finds substantial evidence supports the ALJ's determinations regarding both challenges. Accordingly, the Court recommends Helsper's Motion be denied and the Commissioner's Motion be granted.

A.     **Whether the Hypothetical Question Encompassed All of Helsper's Impairments Regarding the Use of Her Upper Extremities**

Helsper argues the ALJ's reliance on the VE's testimony was improper because the repetitive use of her right arm would affect her left arm negatively, and the ALJ's proposed hypothetical omitted any limitation on the use of her right arm. (Pl.'s Mot for Summ. J at 1). Essentially, she claims the ALJ propounded a faulty hypothetical, which cannot serve as substantial evidence. *See Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996). "It has long been the rule in this circuit that a hypothetical question posed to an ALJ must contain all of claimant's impairments that are supported by the record." *Id.* at 297.

---

Motion may be construed a merely a challenge the VE's opinion regarding laminator work, he found she could perform two other jobs: information clerk and surveillance system monitor. (Admin. R. at 48). The ALJ relied on the VE's testimony about those jobs in his findings at Step Five. (*Id.* at 27). Helsper did not challenge the VE's testimony as to those jobs and, therefore, any argument related to them is waived. *See Gragg v. Astrue*, 615 F.3d 932, 938 (8th Cir. 2010) (issues not challenged are waived). Thus, even if the VE erroneously concluded Helsper could work as a laminator, substantial evidence supports the ALJ's decision at Step Five. *See Bonnell v. Astrue*, 650 F. Supp. 2d 948, 950 (D. Neb. 2009).

Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question. When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence. Thus, the ALJ's hypothetical question must include those impairments that the ALJ finds are substantially supported by the record as a whole.

*Id.* at 296.

The hypothetical omitted a limitation on the repetitive use of Helsper's right arm because nothing in the record supported such a limitation. Helsper cites Dr. Jankus in support of her claim. (Pl.'s Mot. for Summ. J. at 1). Dr. Jankus opined that Helsper

probably cannot get away with [lifting or carrying] more than about maybe 10 to 20 pounds occasionally, maybe 10 pounds more frequently using both arms together with the understanding that is going to be done mostly using the right, asymptomatic arm to support the object and the left one more to stabilize it. She would have difficulty doing any type of continual lifting. With the left scapular myofascial pain issues I think it is reasonable that she not be expected to do any type of repetitive or highly forceful pushing or pulling and she is probably not going to be much in the way of prolonged overheard activities on the left either, both from the stand point of her scapular musculature as well as a tendency to strain the neck if she has to loop up over her head to put things on shelves, for example.

(Admin. R. at 558). Dr. Jankus says nothing about the how the use of Helsper's right arm affects her left side, however. In fact, he concludes that she could lift "frequently" if using both arms, but only "occasionally" if limited to using her left arm. (*Id.*).

Helsper's medical conjecture regarding the impact of the use of her right arm is not sufficient to conclude it had a meaningful effect on her abilities. *See Carlson v. Astrue*, No. 09-cv-2547 (DWF/LIB), 2010 WL 5113808, at *11 (D. Minn. Nov. 8, 2010) ("[L]ay intuitions about medical phenomena are often wrong." (citation omitted)). Apart from Helsper's own contention, no medical opinion or objective medical evidence supports her argument regarding negative impact on her left side caused by repetitive use of her right arm. Thus, the ALJ's hypothetical question properly included all impairments that were accepted by the ALJ as true

and excluded other alleged impairments that the ALJ had reason to discredit. As such, the VE's testimony that Helsper could perform work that exists in significant numbers in the regional economy prior to December 1, 2010, was substantial evidence in support of the ALJ's disability determination. *See Pickney*, 96 F.3d at 296.

### B. Whether Substantial Evidence Supports the ALJ's Pre-December 1, 2010 RFC Determination

Helsper's second argument is premised on a claim that the ALJ improperly determined her RFC. In effect, Helsper argues the ALJ's pre-December 1, 2010 RFC determination is not supported by substantial evidence on the record as a whole because it fails to take into account her "additional limitations" regarding walking, sitting, and standing, which prevented her from performing sedentary work. (Pl.'s Mem. at 1–2). The ALJ concluded Helsper had a modified sedentary RFC prior to December 1, 2010, which included no sitting or standing for more than sixty minutes at a time without interruption; no walking for more than thirty minutes without interruption; no sitting for more than five hours in an eight-hour workday; no standing for more than about three hours in an eight-hour workday; and no walking for more than about two hours in an eight-hour workday. (Admin. R. at 22). In light of the record as a whole, the ALJ's RFC determination was proper.

Social Security Ruling 96–8p defines RFC as an "administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect [the claimant's] capacity to do work-related physical and mental activities." SSR 96–8p, 1996 WL 374184 at *2 (July 2, 1996). "The [ALJ] must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *McKinney v. Apfel*, 228 F.3d 860, 863

(8th Cir. 2000) (citation omitted). Helsper offers no record evidence to support her argument, simply asserting the cumulative effect of her impairments left her disabled her for purposes of Social Security benefits. (Pl.'s Mem. at 1–2). After careful review of the record, the Court finds her assertion is not borne out in the record.

As an initial matter, none of Helsper's providers placed such restrictive walking, sitting, or standing limitations on her. Indeed, the only limitation placed on Helsper was the clearance to return to work under light duty after her surgery. (Admin. R. at 306). The same day she was released for light duty at work, Helsper's motor strength rated at "5/5" and her sensation was intact. (*Id.* at 307–08). Subsequent medical records documented normal motor strength and sensory findings, as well as reports that she was "doing well." (*Id.* at 301). A post-operative MRI revealed the herniation present in before Helsper's surgery was no longer appreciated. (*Id.* at 376). Furthermore, although Helsper reported pain and discomfort with walking, she also stated she could "walk OK," (*Id.* at 196), completed light household chores, (*Id.* at 204), and regularly told providers she exercised by walking on a treadmill and walking her dog. (*Id.* at 399–400, 410–13). Notes from her physician state Helsper often stood through appointments and while reading. (*Id.* at 405–07, 410–13, 449, 611–12).

The ALJ found the record supported some limitation on Helsper's ability to walk, sit, and stand. He properly accounted for those limitations by assessing a sedentary RFC with additional restrictions, but did not find those limitations rose to the level of disabling before to December 1, 2010. The Court is similarly mindful that the record supports a finding that Helsper's impairments limited her abilities prior to December 1, 2010. Nevertheless, substantially evidence in the record as a whole supports the ALJ's decision that Helsper did not meet the definition of disability within the meaning of the Social Security Act before that date.

## IV. RECOMMENDATION

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.  Plaintiff Pamela L. Helsper's Motion for Summary Judgment [Doc. No. 15] be **DENIED**;

2.  Defendant Commissioner's Motion for Summary Judgment [Doc. No. 17] be **GRANTED**.

Dated: May 30, 2013

_s/ Steven E. Rau_

STEVEN E. RAU
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **June 13, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.